**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| LAZEREK AUSTIN (#K77091), | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | Case No. 10 C 6474 |
| v. | ) | |
| | ) | |
| RICK HARRINGTON, Warden, | ) | |
| Menard Correctional Center, | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

Before the Court is pro se Petitioner Lazerek Austin's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254(d). For the following reasons, the Court denies Austin's habeas petition and declines to certify any issues for appeal pursuant to 28 U.S.C. § 2253(c)(2).

## BACKGROUND

Austin does not present clear and convincing evidence challenging the statement of facts in the last state court decisions addressing his arguments on the merits, and thus the Court presumes those facts are correct for purposes of its habeas review. *See* 28 U.S.C. § 2254(e)(1); *Bolton v. Akpore,* 730 F.3d 685, 687 (7th Cir. 2013). The Court therefore adopts the underlying facts as set forth by the Illinois Appellate Court in *People v. Austin*, No. 1-10-3616 (1st Dist. Sept. 14, 2012) (unpublished) and *People v. Austin,* No. 1-06-0198 (1st Dist. Sept. 4, 2009) (unpublished).

### I.  Factual Background

In November 2002, Chicago police arrested and charged Austin for his involvement in the January 3, 2002 robbery of the Economy Auto Repair shop located at 1525 North Lawndale

Avenue in Chicago, as well as the kidnaping and subsequent murder of two of the shop's employees, Renee Tapia and James Flores. At Austin's February 2005 bench trial in the Circuit Court of Cook County, the parties presented over twenty witnesses. The Court will discuss the trial evidence relevant to Austin's claims in the present habeas petition.

At trial, the receptionist at the Economy Auto Repair shop, Adilia Palansia, testified that on January 3, 2002, she was in the shop with five other employees, including the murder victims Tapia and Flores. She further testified that around noon on that date, an African-American man entered the shop demanding money, as well as keys to Flores' office. Palansia testified that the man was wearing a ski mask when he approached her desk. When Palansia did not produce the money or the keys, the man began hitting her repeatedly. He then dragged her to the dining area of the shop, at which time Palansia saw another African-American man. The second man hit her across the face resulting in a broken nose. Palansia testified that she then fainted and fell to the floor.

When she regained consciousness, Palansia realized that she was on the floor at the back of the store next to Flores and that her hands and feet were bound with tape. At that time, Palansia closed her eyes, but heard the attackers take Flores to the shop's office demanding him to open the safe. She also heard the men beating Tapia. Further, Palansia testified that the men began to talk about killing them, after which she closed her eyes and stopped breathing. The men thought Palansia was dead. Thereafter, the men dragged Flores and Tapia away. Palansia opened her eyes, realized she was alone, and crawled to the front room where she freed herself and sought help. A neighbor helped her call the police. In addition, Palansia testified that on October 27, 2002, she went to the Area 4 police station to look at a lineup where she identified

Austin's co-defendants, Olauden Slaughter and Craig Lomax, as the men who robbed the repair shop, assaulted her, and took Flores and Tapia away.

Jose Gallegos, Tapia's step-uncle, also testified at Austin's February 2005 bench trial. Gallegos stated that he went to the Economy Auto Repair shop on January 3, 2002 to meet Tapia. While Gallegos was waiting for Tapia, Flores asked him to pick up some automobile parts for him at a nearby store. Gallegos obliged and when he turned to leave the shop, he saw two African-American men who asked him to point out the mechanic. Gallegos then turned around and told Flores that the two men were looking for him. Furthermore, Gallegos testified that when he was leaving the shop, he observed a van in front of the store that had not been there when he initially arrived. According to Gallegos, the van had white thin lines on the sides and was parked backwards toward the entrance. Gallegos identified photographs of the van at trial.

Austin's friend, Marquand Williams, also testified at the February 2005 bench trial. He stated that in November 2001, he frequently visited the Economy Auto Repair shop with Austin or Austin's brother to buy narcotics. Williams testified that in October and November 2001, Austin talked to him about robbing the auto repair shop and asked Williams to "stake out" the shop for this purpose, although Williams testified that he never actually "staked out" the shop. Several days after the robbery, Austin told Williams that he had kidnaped and killed "the two Mexicans" at the Economy Auto Repair. Williams also testified that Austin told him that he shot one of "the Mexicans" and "blew the motherfuckers knee off."

On cross-examination, Williams admitted that his primary source of income was narcotics sales and that he had been arrested for manufacturing and possessing narcotics. He also testified that he was released on home monitoring, but violated his home monitoring in

October 2002, and thus was sent back to prison.  Williams further testified that he had asked

Austin to bail him out, but Austin refused.  Shortly thereafter, Williams contacted the police to

inform them that he had information about the Economy Auto Repair murders.  Also on cross-

examination, Williams testified that he felt betrayed by Austin because he had bonded Austin's

brother out of jail in 1998 and that in 1999, Austin and others beat him for not helping Austin's

brother when the police had chased him.

Also, defense counsel asked Williams about the inconsistencies between his trial

testimony and his grand jury testimony.  To clarify, Williams testified before the grand jury that

Austin confessed to the crime while the two men were in Austin's apartment, whereas at trial,

Williams stated that the confession occurred in Austin's car.  At trial, Williams explained that

Austin confessed to him more than once.

The State also called Shaun Glover at Austin's February 2005 bench trial.  Glover

testified that in January 2002, he owned a green van and that on a day in early January 2002 at

about 11 a.m., he was standing in front of his house at Central Park Avenue and Flournoy Street

in Chicago when Austin drove up in his gray four-door Chevrolet and asked to borrow Glover's

van.  Austin told Glover that he needed the van so that he and "some guys" could "get high."

Glover testified that he let Austin use his van and Austin gave Glover the keys to the Chevrolet

in exchange.  Also, Glover observed Austin getting into the driver's seat and that Austin's co-

defendant got in the front passenger seat.  According to Glover, later that night, at approximately

11:30 p.m., Austin's co-defendant and another man named Cornell Cardine came over to

Glover's house and told him that the van was at the local car wash.  Glover then went to the car

wash with his girlfriend to pick up his van.  Once he got to the car wash, Glover discovered

blood all over the dashboard and floor, panicked, and left the van at the car wash. Further, Glover testified that a few days later he spoke to Austin on the street and asked him what had happened. Austin answered that "somebody got shot in the leg" and that it was "one of his buddies."

On cross-examination, Glover acknowledged that he was a convicted felon and that his prior convictions included a conviction for aggravated battery of a police officer on April 16, 2003, for which he received 18 months of probation and a conviction for possession of a controlled substance on September 29, 2004, for which he received 24 months of probation. Also on cross-examination, Glover admitted that he could not recall the exact date on which he loaned his van to Austin nor which date he talked to Austin about the blood in his van. On re-direct, Glover testified that he loaned his van to Austin only once.

Austin's girlfriend, Inesha Scott, also testified at trial. She stated that around noon on January 3, 2002, she was at the apartment of Austin's sister in Chicago where Austin kept a safe. More specifically, Scott was there with Austin, Austin's siblings, and other individuals including one of Austin's co-defendants, Olauden Slaughter. She testified that she heard Austin ask Slaughter whether he had "the ski masks and gloves." Thereafter, Slaughter gave Austin a black ski mask. Also, Scott testified that Austin opened the safe and took out his gun. Scott observed Austin put his gun under his shirt and then leave the apartment.

Scott testified that later that night, she saw Austin in a taxi at which time he asked her to come over. Scott then got in the taxi and went with Austin to his apartment at 1609 North LeClaire Avenue in Chicago where Slaughter and Austin's other co-defendant Craig Lomax met them, as well as a third man named Lydelle Cardine. Once inside Austin's apartment, they

proceeded to Austin's bedroom where Scott heard Austin say, "I told you all don't shoot them guys." Also, Scott testified that Austin asked them where the van was. Further, Scott observed a heap of money on top of Austin's television set. Thereafter, Scott went to her aunt's house with Austin where they spent the night. Scott testified that while they were watching the news, Austin kept repeating, "man, man, man, man." In addition, Scott testified that Austin took her to the Economy Auto Repair shop on a few occasions prior to the January 3, 2002 kidnaping and murders.

On cross-examination, Scott testified that she did not see Austin place the money on the television set in his apartment and she did not know how long the money had been there before they entered the apartment. She also acknowledged that she did not talk to the police until November 2002, and that she recalled that all of this had occurred on January 3, 2002, because the detective who interviewed her reminded her of the date. When probed about her ability to recollect events, Scott was unable to remember what she had done or where she had been on several more recent dates. On redirect examination, however, the State established that Scott's birthday was January 7, and she recalled that all of the events to which she testified occurred before her birthday.

The State also called Cornell Cardine as a witness. Cardine testified that the police had arrested him pursuant to a bench warrant for his failure to appear in Austin's case. At trial, Cardine first admitted that in November 2002, two police detectives took him out of a boot camp at Cook County Jail, where he was incarcerated for an unrelated offense, to interview him about the Austin's case. Cardine initially admitted that after speaking to the police detectives, he gave a handwritten statement to a Cook County Assistant State's Attorney, and that consistent with

that statement, he provided incriminating testimony against Austin before the grand jury.

Nevertheless, Cardine recanted both his handwritten statement and his grand jury testimony at

Austin's February 2005 bench trial. In doing so, Cardine explained that the police detectives

gave him some "jotted down statements to remember" and that he merely repeated them to the

Assistant State's Attorney. Cardine further explained that he "went along with the story the

detectives gave him" because they led him to believe that Austin had been involved in his

brother's murder. In addition, Cardine testified that he initially refused to cooperate with the

police, but agreed only after the police detectives threatened punitive measures. Cardine

admitted, however, that his recantation happened after he was placed in the same lock-up as

Austin when he was arrested on the bench warrant.

Given Cardine's recantation, the State proceeded to use Cardine's grand jury testimony

to impeach him. Thereafter, Cardine acknowledged that at that grand jury hearing he testified to

the following: Cardine, his brother Lydelle, Austin, Lomax, and Slaughter were all members of

the Unknown Vice Lords gang. On the evening of January 3, 2002, Cardine was in the front

passenger seat of a Saturn, owned by the gang, when he observed Austin and Lomax on the

corner of Franklin Boulevard and Kedzie Avenue in Chicago. Lydelle, who was driving the

Saturn, got out of the car and spoke to Austin and Lomax, then returned to the car and told

Cardine that the two men wanted them to follow. Cardine then observed Austin and

Lomax walk into a nearby alley. Soon thereafter, Lomax appeared driving Glover's greenish-

turquoise van and motioned Lydelle to follow. Five minutes later, at the corner of Cicero

Avenue and Kinzie Street, Slaughter and another member of the Unknown Vice Lords gang

known as "Lil' Wayne" came out of the van, got into the Saturn, and told Lydelle to keep

following the van. After a couple of blocks, the van stopped next to the railroad tracks at Kenton Avenue, whereupon Slaughter instructed Lydelle to drive the Saturn about a half a block past the van and then stop. After Lydelle obliged, Slaughter ran back toward the van and then Cardine heard three to four gun shots. Slaughter returned to the Saturn and told Lydelle to drive to the local car wash on Madison and Homan. Once there, Lomax exited the van, spoke to the car wash employees, returned to the Saturn, and instructed Lydelle to drive to Central Park Avenue and Flournoy Street, where everyone got out of the car and "went on about their business."

In addition, the Circuit Court allowed the State to introduce Cardine's handwritten statement into evidence. The handwritten statement was consistent with Cardine's grand jury testimony. In his handwritten statement, Cardine also admitted that a few days after the incident he read "about some guys getting kidnaped from a garage or auto body place and getting killed" near Kenton Avenue, and realized that Austin, Lomax, and Slaughter were involved. He stated, however, that he did not go to the police at that time because he was afraid that Austin, Lomax, or Slaughter would hurt him or his brother.

Chicago Police Detective Robert Rodriguez also testified at Austin's bench trial. He stated that on January 4, 2002, he observed two bodies near a small embankment under railroad trestles near 358 North Kenton Avenue in Chicago. Detective Rodriguez testified that both bodies were stripped naked and were frozen due to the low temperature. The bodies were later identified as Tapia and Flores. He stated that the police retrieved some objects near the bodies, including a cigarette butt, two .380 Winchester cartridge cases, and some gray duct tape.

The parties stipulated that the police recovered Glover's van and processed it for evidence finding that the blood found on the carpet belonged to one of the victims, namely,

Tapia.  In addition, the DNA testing on the cigarette butt found near the bodies of Tapia and Flores revealed DNA belonging to Tapia and saliva belonging to Slaughter.

At Austin's trial, the medical examiner and expert forensic pathologist testified that on January 5, 2002, he performed Tapia's and Flores' autopsies.  He opined to a reasonable degree of scientific certainty that both deaths were homicides — Flores' death was the result of multiple gunshot wounds and Tapia's death was the result of multiple stab and gunshot wounds.

After the State rested, Austin called two witnesses, Detective Hennigan and Assistant State's Attorney John Maher, to discredit Williams' testimony.  Detective Hennigan testified that while he routinely tells witnesses he cannot make promises in exchange for their testimony, he told Williams that he would speak to an Assistant State's Attorney about Williams' safety concerns in prison.  At trial, Detective Hennigan admitted that he spoke to an Assistant State's Attorney about securing Williams' release on electronic monitoring.  In addition, Maher stated that at the time Williams testified at Austin's grand jury hearing in October 2005, Williams knew the efforts the State was making to have him released from prison.

## II.    Procedural Background

Following his February 2005 bench trial, the Cook County Circuit Court found Austin guilty of two counts of first degree murder.  At his December 16, 2005 sentencing, the Circuit Court judge sentenced Austin to natural life imprisonment.  Austin, by counsel, appealed to the Illinois Appellate Court, First District, arguing that: (1) the trial evidence was insufficient to sustain his conviction for first degree murder under an accountability theory; and (2) his trial counsel was ineffective because he failed to impeach Glover and Scott.  On September 4, 2009, the Illinois Appellate Court affirmed Austin's conviction.  Thereafter, Austin, by counsel, filed a

petition for leave to appeal ("PLA") in the Supreme Court of Illinois arguing that his trial counsel was constitutionally ineffective for failing to impeach Glover and Scott. On November 25, 2009, the Supreme Court of Illinois denied Austin's PLA. Austin maintains that he filed a petition for a writ of certiorari in the United States Supreme Court on February 24, 2010, but Respondent asserts that the Supreme Court docket does not show that any such petition was filed.

On August 23, 2010, Austin filed a pro se post-conviction petition pursuant to the Illinois Post-Conviction Hearing Act, 725 ILCS 5/122-1, *et seq.*, in the Circuit Court of Cook County arguing: (1) that his trial counsel was constitutionally ineffective for (a) advising him not to seek a jury trial, (b) agreeing to stipulate to the admissibility of DNA evidence, (c) failing to object to the prosecutor's mischaracterization of DNA evidence in closing arguments, (d) failing to interview witness Cornell Cardine in the presence of a third-party for prove-up purposes, and (e) failing to object to the State's discovery violation regarding Marquand Williams; (2) the trial court erred in allowing the State to introduce Cornell Cardine's recanted grand jury and handwritten statements; (3) the trial court erred in admitting Glover's prior consistent statements; (4) the State and trial court violated his due process rights in the form of improper closing arguments and discovery violations; (5) the trial evidence was insufficient to sustain his conviction for first degree murder; and (6) ineffective assistance of appellate counsel. On October 28, 2010, the Circuit Court dismissed Austin's post-conviction petition as frivolous and patently without merit. *See* 725 ILCS 5/122–2.1(a)(2). Austin, by counsel, appealed to the Illinois Appellate Court arguing that his trial counsel was constitutionally ineffective for failing to object to the admission of Cardine's prior inconsistent statements. On September 14, 2012,

the Illinois Appellate Court affirmed the dismissal of Austin's post-conviction petition. Austin, by counsel, filed a PLA in the Supreme Court of Illinois arguing that his trial counsel was constitutionally ineffective for failing to object to the admission of Cardine's prior inconsistent statements. The Supreme Court of Illinois denied his PLA on November 28, 2012.

On November 28, 2012, Austin filed a successive pro se post-conviction petition under the Illinois Post-Conviction Hearing Act based on his discovery that the prosecution provided witness Inesha Scott, his former girlfriend, with relocation expenses in consideration for her testimony at trial. Austin maintained that the State's failure to turn over this information violated *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and that had he been so informed, he would not have waived his right to a jury trial. This successive post-conviction petition is currently pending in the Circuit Court of Cook County.

Austin filed a pro se habeas petition in federal court on October 8, 2010. On September 14, 2010, the Court granted Austin's motion to stay his petition pending the disposition of his post-conviction proceedings. The Court lifted the stay on September 18, 2013. On October 16, 2013, Austin filed a supplemental habeas petition.

## III.    Habeas Petition

Austin's supplemental habeas petition unequivocally states that wants to proceed only on the issues in his supplemental habeas petition and that he is abandoning the remainder of his original habeas claims. (R. 30, Supp. Habeas Pet., at 2.) Construing Austin's pro se allegations in his supplemental habeas petition liberally, *see Turley v. Rednour,* 729 F.3d 645, 651 (7th Cir. 2013), he brings the following claims: (1) a sufficiency of the evidence claim under *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); (2) an ineffective assistance of

trial counsel claim based on counsel's failure to impeach State's witness Inesha Scott regarding

her anger towards Austin and her drug and alcohol use; (3) an ineffective assistance of trial

counsel based on counsel's failure to impeach the State's witness Shaun Glover with the fact that

he received probation after cooperating with prosecutors in Austin's case; and (4) a *Brady* claim

based on the State's failure to disclose that it provided Scott with relocation expenses.

## LEGAL STANDARD

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), the Court

cannot grant habeas relief unless the state court's decision was contrary to, or an unreasonable

application of federal law clearly established by the Supreme Court. *See Williams v. Taylor,* 529

U.S. 362, 402-03, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000); *Warren v. Baenen,* 712 F.3d 1090,

1096 (7th Cir. 2013). In *Williams*, the Supreme Court explained that a state court's decision is

"contrary to" clearly established Supreme Court law "if the state court arrives at a conclusion

opposite to that reached by this Court on a question of law" or "if the state court confronts facts

that are materially indistinguishable from a relevant Supreme Court precedent and arrives at a

result opposite to ours." *See id.* at 405; *see also Kamlager v. Pollard,* 715 F.3d 1010, 1015 (7th

Cir. 2013) ("A state court decision is 'contrary to' federal law if it applies the wrong legal

standard established by Supreme Court precedent or decides a case differently than the Supreme

Court on materially indistinguishable facts.").

Under the "unreasonable application" prong of the AEDPA standard, a habeas petitioner

must demonstrate that although the state court identified the correct legal rule, it unreasonably

applied the controlling law to the facts of the case. *See Williams,* 529 U.S. at 407. "The state

court's application of federal law must not only be incorrect, but 'objectively unreasonable.'"

*Rann v. Atchison,* 689 F.3d 832, 835 (7th Cir. 2012); *see also Williams*, 529 U.S. at 410

("*unreasonable* application of federal law is different from an *incorrect* application of federal

law") (emphasis in original). To be considered objectively unreasonable, a state court's decision

must be "well outside the boundaries of permissible differences of opinion." *Kamlager,* 715

F.3d at 1016 (citation omitted); *see also Dietrich v. Smith,* 701 F.3d 1192, 1194 (7th Cir. 2012).

In other words, to be objectively reasonable, the state court's decision must be "at least

minimally consistent with the facts and circumstances of the case." *Hall v. Zenk,* 692 F.3d 793,

798 (7th Cir. 2012) (citation omitted).

## ANALYSIS

### I.      Sufficiency of the Evidence Claim

First, Austin argues that the State failed to prove his guilt beyond a reasonable doubt.

The clearly established Supreme Court law that applies to this habeas claim is set forth in

*Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). *Jackson* holds

that due process is satisfied if—when viewing the evidence in the light most favorable to the

prosecution—"*any* rational trier of fact could have found the essential elements of the crime

beyond a reasonable doubt." *Id.* (emphasis in original). The *Jackson* standard "gives full play to

the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the

evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id.*

Austin procedurally defaulted this claim because although he raised it on direct appeal

before the Illinois Appellate Court, he failed to raise it on direct appeal in his PLA to the

Supreme Court of Illinois. Nevertheless, the Court addresses the merits of Austin's claim for the

sake of completeness. In reviewing Austin's claim, the Illinois Appellate Court identified the

correct legal standard — "[w]hen considering a challenge to the sufficiency of the evidence, the relevant question on appeal is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  The Illinois Appellate Court cited Illinois case law that relied upon the Supreme Court's *Jackson* decision.  *See People v. Hall,* 194 Ill.2d 305, 330, 743 N.E.2d 521, 536, 252 Ill.Dec. 653, 668 (Ill. 2000) (citing *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979)).

The Illinois Appellate Court then applied *Jackson* to Austin's case by outlining the elements of first degree murder under accountability principles.  Specifically, the Illinois Appellate Court set forth that under Illinois law, a person commits first degree murder when he kills an individual and either intended to kill or do great bodily harm to that individual; or knows that his acts create a strong probability of death or great bodily harm.  *See* 720 ILCS 5/9-1(a)(1)-(2).  Also, a person is accountable for another's murder if the person has the mental state described by the murder statute, causes another person to commit the murder, and with the intent to promote or facilitate commission of the murder, solicits, aids, abets, agrees or attempts to aid the other person in planning or committing the offense.  *See* 720 ILCS 5/5-2(a), (c).

The State's theory of the case, presented primarily through the testimony of Williams, Glover, Scott, and Cardine, was that Austin master-minded the plan to rob the Economy Auto Repair that resulted in the kidnaping and murder of Tapia and Flores.  In concluding that there was sufficient evidence to convict Austin of first degree murder under accountability principles, the Illinois Appellate Court reasoned:

> [E]ven without any physical evidence specifically linking [Austin] to the
> crimes, and without Williams' testimony as to [Austin]'s confession, there was

sufficient evidence presented to the trial court to establish [Austin]'s culpability on a theory of accountability. Specifically, there was witness testimony from Glover establishing that at about 11 a.m., on the morning of the robbery, [Austin] obtained Glover's van, and drove away in it with codefendant Lomax in the front passenger seat. Later that morning, at about noon, [Austin] was observed by his girlfriend, Scott, speaking to codefendent Slaughter in [Austin]'s sister's apartment, and asking Slaughter whether he had "the ski masks and gloves." Thereupon [Austin] took a black ski mask from codefendant Slaughter, removed a handgun from the safe he kept in his sister's apartment, "clicked back the gun," and placed it under his shirt, before leaving the apartment. [Austin] was subsequently observed by Cardine walking near Franklin Boulevard and Kedzie Avenue with codefendant Lomax, when Lomax motioned Cardine to follow the two men, and then proceeded to enter a nearby alley with [Austin], from which Glover's van soon reappeared. Codefendant Lomax, who was driving the van, motioned Cardine to follow. The van immediately proceeded to the train tracks at Kenton Avenue, where Cardine heard gunshots coming from its direction, and where the bodies of the two victims were later found. Finally, the evidence presented at trial revealed that later that same night, [Austin] was seen by his girlfriend discussing the robbery with codefendant Slaughter and Lomax, in his apartment. Specifically, [Austin]'s girlfriend, overheard [Austin] ask codefendants what they had "done with the van," and stating, "I told you all not to shoot them guys." This evidence was more than sufficient to permit the trial court to infer that [Austin] participated at least on a theory of accountability if not by direct involvement in the crime.

*People v. Austin,* No. 1-06-0198, at 33-34.

The Illinois Appellate Court's decision was a reasonable application of *Jackson* because it was well within the boundaries of permissible differences of opinion. *See Kamlager,* 715 F.3d at 1016. In other words, the state court's ruling was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter,* 131 S.Ct. 770, 786-87 (2011). Specifically, the Illinois Appellate Court — viewing the evidence in the State's favor — reasonably concluded that, despite certain credibility issues pertaining to Williams' testimony that Austin now challenges, there was sufficient evidence of Austin's guilt. Indeed, there was witness testimony that on the morning of the robbery, Austin borrowed Glover's van and drove away

with Lomax in the front passenger seat.  Gallegos identified photographs of the van as the one

parked in front of the shop on the day in question.  Austin's girlfriend testified that later that

morning Austin asked Slaughter whether he had "the ski masks and gloves" after which Austin

took a black ski mask from Slaughter, removed a handgun from a safe, "clicked back the gun,"

and placed it under his shirt.  Additional testimony included Cardine observing Austin and

Lomax walking near Franklin Boulevard and Kedzie Avenue then entering a nearby alley from

which Glover's van reappeared.  Lomax, who was driving the van, motioned Cardine to follow

them.  The van immediately proceeded to the train tracks at Kenton Avenue, where Cardine

heard gunshots and where police later found the victims' bodies.  Later that day, Scott overheard

Austin talking with Slaughter and Lomax stating, "I told you all not to shoot them guys."  In

addition, blood found on the carpet of the van belonged to Tapia and DNA recovered from a

cigarette butt near the victims' bodies contained Slaughter's saliva.

In evaluating the sufficiency of the evidence, the Illinois Appellate Court looked to the

totality of the evidence, concluding that the evidence supported Austin's conviction.  Under the

Court's deferential standard of review, this conclusion was objectively reasonable.  Thus,

Austin's attempt to look at each piece of evidence in isolation is unavailing.  *See United States v.*

*Farmer,* 717 F.3d 559, 563 (7th Cir. 2013) ("The law does not require that each piece of

evidence exclude beyond a reasonable doubt the possibility of innocence."); *Trejo v. Hulick,* 380

F.3d 1031, 1032 (7th Cir. 2004) ("Always to be borne in mind is that 'a number of weak proofs

can add up to a strong proof.'") (citation omitted).  The Court therefore denies Austin's

sufficiency of the evidence claim.

## II.     Ineffective Assistance of Counsel Claims Based on Failure to Impeach

Austin brings several ineffective assistance of counsel claims in his habeas petition.  To establish constitutionally ineffective assistance of trial counsel under the Sixth Amendment, Austin must show that (1) his trial attorney's performance "fell below an objective standard of reasonableness," and (2) "but for counsel's unprofessional errors the result of the proceeding would have been different."  *Strickland v. Washington,* 466 U.S. 668, 688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).  The Court's "review of the attorney's performance is 'highly deferential' and reflects 'a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.'" *Koons v. United States,* 639 F.3d 348, 351 (7th Cir. 2011) (citation omitted).  "It is essential to evaluate the entire course of the defense, because the question is not whether the lawyer's work was error-free, or the best possible approach, or even an average one, but whether the defendant had the 'counsel' of which the sixth amendment speaks."  *Williams v. Lemmon*, 557 F.3d 534, 538 (7th Cir. 2009) (per curiam).  To establish prejudice, it is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding," instead trial counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Morgan v. Hardy,* 662 F.3d 790, 802 (7th Cir. 2011) (quoting *Strickland*, 466 U.S. at 687, 693). If Austin fails to make a proper showing under one of the *Strickland* prongs, the Court need not consider the other.  *See Strickland,* 466 U.S. at 697 ("a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant").

## A.  Failure to Impeach Shaun Glover

Austin argues that his trial counsel was constitutionally ineffective because he failed to impeach Glover with the fact that the State reduced his charge of aggravated battery of a police officer to a misdemeanor following Glover's cooperation in Austin's criminal matter.  On appeal, the Illinois Appellate Court identified the correct legal standard pursuant to *Strickland*. Thereafter, the court acknowledged that failing to impeach Glover with this evidence was unsound trial strategy.

Nevertheless, the Illinois Appellate Court concluded that Austin could not establish that counsel's omission impacted the outcome of Austin's bench trial.  In other words, the Illinois Appellate Court found that Austin could not establish counsel's performance prejudiced him.  In particular, based on the totality of the evidence, the Illinois Appellate Court concluded:

> [E]ven if Glover's testimony had been so impeached as to discredit his entire testimony, in light of the totality of the remaining evidence presented at trial, there is no reasonable probability that the outcome of [Austin]'s proceedings would have been different....  [E]vidence included Scott's testimony that immediately prior to the robbery, she observed [Austin] asking codefendant Slaughter whether he had 'the ski masks and gloves,' whereupon [Austin] took a black ski mask from Slaughter, removed a handgun from the safe, which he kept in his sister's apartment, 'clicked back the gun,' and placed it under his shirt, before leaving the premises.  Later that day [Austin] was observed by Cardine walking with codefendant Lomax near Franklin Boulevard and Kedzie Avenue, when codefendant Lomax motioned Cardine to follow them.  Cardine watched as the two entered an alley, from which Glover's van, positively identified as the van used in the robbery through DNA evidence and eyewitness testimony of Gallagos, appeared.  The van immediately proceeded to the train tracks at Kenton Avenue, where Cardine heard gunshots, and the bodies of the two victims were later found. Further, [Austin]'s girlfriend, Scott testified that later that same night, she observed [Austin] in his own apartment discussing the robbery with codefendants Slaughter and Lomax, and heard him ask codefendant what they had "done with the van," and saying, "I told you all not to shoot them guys."  Thus, even in the absence of Glover's testimony, the evidence was abundant from which to infer [Austin]'s participation in the robbery, kidnaping, and ultimately murder committed throughout the course of that day.

*People v. Austin,* No. 1-06-0198, at 39-40.

The Illinois Appellate Court's conclusion that Austin did not establish the *Strickland* prejudice prong is well within the boundaries of permissible differences of opinion, and thus is not objectively unreasonable. *See Dietrich,* 701 F.3d at 1194; *see also Harrington,* 131 S.Ct. at 786-87. As discussed, the State presented overwhelming evidence of Austin's guilt, and in the context of the totality of the evidence, counsel's failure to impeach Grover regarding his reduced charge did not prejudice Austin under the second *Strickland* prong. Therefore, the Illinois Appellate Court's decision was not an unreasonable application of *Strickland.* The Court denies this habeas claim.

### B.  Failure to Impeach Inesha Scott

Austin also maintains that his trial counsel was constitutionally ineffective for failing to impeach Scott about her bias and motive to testify against him based on letters she wrote to him after his arrest. In rejecting this ineffective assistance argument, the Illinois Appellate Court reasonably concluded that counsel's performance was not deficient in failing to impeach Scott because the letters she wrote to Austin not only revealed her anger towards him, but that she also loved Austin. The Illinois Appellate Court highlighted the trial court's reasoning at Austin's post-trial hearing:

> There's no question[] as I read those letters the emotions of this young lady fluctuate while it's obvious that she's very much in love with [Austin] in these matters. At times in the letters she expresses those loves in the greatest of terms, and at times in those letters she expresses her anger for his violation of her trust involving another young lady.
>
> Those letters conform to the testimony that I heard from her as she sat on the witness stand. It was apparent to this court that she still had very, very strong feelings for [Austin] when she was on the stand. It's also apparent that things weren't going very well with them also while she was testifying as I watched her

demeanor.

*People v. Austin,* No. 1-06-0198, at 40-41.  The Illinois Appellate Court's decision that any such impeachment of Scott did not exhibit ineffective assistance of counsel is minimally consistent with the facts and circumstances of the case — especially in light of the fact that much of this evidence was not impeaching in the first instance.

Finally, even if counsel's performance had been deficient under the first *Strickland* prong, the Illinois Appellate Court reasonably concluded Austin could not establish that counsel's failure to impeach Scott in this manner would have changed the outcome of Austin's trial under the *Strickland* prejudice prong.  Accordingly, viewing trial counsel's representation as a whole, Austin cannot establish that counsel's performance was deficient nor that it prejudiced him.  *See Williams*, 557 F.3d at 538 ("The Supreme Court insists that judges must not examine a lawyer's error (of omission or commission) in isolation.").  The Court denies Austin's ineffective assistance of counsel claim based on counsel's failure to impeach Scott with this evidence.

**III.    Brady Claim**

Next, Austin brings a claim under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), based on his discovery that the prosecution provided his girlfriend Scott with relocation expenses in consideration for her trial testimony.  Austin argues that the State's failure to turn over this information violated *Brady*, and that had he been informed of this evidence, he would not have waived his right to a jury trial.  Although Austin has not exhausted this claim, "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the

State." 28 U.S.C. § 2254(b)(2); *see also Bolton v. Akpore,* 730 F.3d 685, 696 (7th Cir. 2013). The Court thus analyzes the merits of Austin's *Brady* claim under the standard set forth in 28 U.S.C. § 2243, requiring the Court to "dispose of the matter as law and justice require."

As discussed, Austin contends that the State withheld information related to expenses the Office of the State's Attorney of Cook County incurred to relocate the State's witness, Inesha Scott, prior to trial. Austin provided the Court with documents showing that Scott made a request to relocate because his family had contacted her to change her testimony that disfavored him. (R. 20, 12/02/02 Victim/Witness Request.) Due to this contact, Scott feared that Austin or his family "would take action against her." (*Id*.) In her Victim/Witness Request, Scott asked for first month's rent, a security deposit, and moving expenses. (*Id*.) Based on these facts, Austin argues that the State paid Scott for cooperating in his prosecution and that the State did not disclose any such payments to the defense.

A *Brady* violation occurs when the prosecution suppresses evidence favorable to the accused and the evidence was material to an issue at trial. *See Brady,* 373 U.S. at 87 ("[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment"). Accordingly, to succeed on his *Brady* claim, Austin must show that: "(1) the evidence at issue must be favorable to the accused, either because it is exculpatory or because it is impeaching; (2) the evidence must have been suppressed by the government, and (3) the evidence must be material, that is, there must be 'a reasonable probability that the suppressed evidence would have produced a different verdict.'" *United States v. Morales,* 746 F.3d 310, 314 (7th Cir. 2014) (quoting *Strickler v. Greene*, 527 U.S. 263, 281–82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999)).

Austin has failed to establish the first *Brady* element, namely, that the relocation payment evidence is favorable to him. Specifically, evidence of Scott's relocation costs cuts both ways because it reveals that Scott feared that Austin or his family "would take action against her" if she testified for the State. *See United States v. McMahan,* 495 F.3d 410, 424 (7th Cir. 2007), *vacated in part on other grounds,* 552 U.S. 1091, 128 S.Ct. 917, 169 L.Ed.2d 719 (2008). More specifically, had defense counsel impeached Scott on this information, the State would have inquired why Scott requested relocation, namely, that she feared retaliation by Austin and his family.

Moreover, this evidence is not material because it does not create a "'reasonable probability' that its disclosure to the defense would have changed the result of the trial." *Morales*, 746 F.3d at 315. In other words, this evidence does not "put the whole case in such a different light as to undermine confidence in the verdict." *United States v. Villasenor,* 664 F.3d 673, 683 (7th Cir. 2011) (citation omitted). The State presented overwhelming evidence of Austin's guilt, and thus this insignificant impeachment evidence would not have changed the result. As such, Austin cannot establish that the withholding of this evidence prejudiced him. Because Austin's *Brady* claim is without merit, his threadbare argument that had he known about this evidence — which is clearly not material under *Brady* — he would have asked for a jury trial is equally unavailing.

## IV.    Certificate of Appealability

Under the 2009 Amendments to Rule 11(a) of the Rules Governing Section 2254 Proceedings, the "district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Accordingly, the Court must determine whether to grant

Austin a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(2) in the present order. *See Gonzalez v. Thaler,* ___ U.S. ___, 132 S.Ct. 641, 649 n.5, 181 L.Ed.2d 619 (2012).

A habeas petitioner does not have the absolute right to appeal a district court's denial of his habeas petition, instead, he must first request a certificate of appealability. *See Miller-El v. Cockrell,* 537 U.S. 322, 335, 123 S.Ct. 1029, 1039, 154 L.Ed.2d 931 (2003); *Bolton,*730 F.3d at 697. A habeas petitioner is entitled to a certificate of appealability only if he can make a substantial showing of the denial of a constitutional right. *See Miller-El,* 537 U.S. at 336; *Thomas v. Zatecky,* 712 F.3d 1004, 1006 (7th Cir. 2013); 28 U.S.C. § 2253(c)(2). Under this standard, Austin must demonstrate that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller-El,* 537 U.S. at 336 (quoting *Slack v. McDaniel,* 529 U.S. 473, 484, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000)). In cases where a district court denies a habeas claim on procedural grounds, a certificate of appealability should issue only if the petitioner shows that (1) jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right, and (2) jurists of reason would find it debatable whether the district court was correct in its procedural ruling. *See Slack,* 529 U.S. at 485.

Here, jurists of reason would not debate the Court's conclusion that the Illinois Appellate Court reasonably applied *Jackson* and *Strickland* to the facts and circumstances of this case. Further, reasonable jurists would not debate the Court's conclusion that Austin's *Brady* claim was without merit. Therefore, the Court declines to certify any issues for appeal. *See* 28 U.S.C. § 2253(c)(2).

**CONCLUSION**

For these reasons, the Court denies Austin's petition for a writ of habeas corpus and declines to certify any issues for appeal. *See* 28 U.S.C. §§ 2253(c)(2), 2254(d).

**Dated:** June 16, 2014

ENTERED

AMY J. ST. EVE
United States District Judge